# 14-2911

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

RBC AIRCRAFT PRODUCTS, INC.,

Plaintiff-Counter-Defendant – Appellant,

v.

PRECISE MACHINING & MANUFACTURING, LLC,

Defendant-Counter-Claimant – Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF CONNECTICUT

## PAGE PROOF BRIEF OF
## PLAINTIFF-COUNTER-DEFENDANT – APPELLANT

Jeffrey R. Babbin
Joseph W. Martini
Matthew C. Brown
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400

*Attorneys for
Plaintiff – Appellant
RBC Aircraft Products, Inc.*

## **CORPORATE DISCLOSURE STATEMENT**

RBC Aircraft Products, Inc. is a wholly owned subsidiary of Roller Bearing Company of America, Inc. ("RBCA"). RBCA is a wholly owned subsidiary of RBC Bearings Incorporated. No publicly held corporation owns 10% or more of the stock of that parent corporation.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..........................................i

TABLE OF AUTHORITIES ....................................................iv

JURISDICTIONAL STATEMENT .........................................1

ISSUES PRESENTED FOR REVIEW .................................2

STATEMENT OF THE CASE................................................4

I.    Introduction.................................................................4

II.    Procedural History ....................................................6

       A.    The Lawsuit and Verdict .....................................6

       B.    The District Court's Ruling...............................11

III.    The Trial Record........................................................14

       A.    RBC and Precise Were Part of the Boeing 737 Supply Chain ...........14

       B.    The Parties' Five-Year Course of Dealing and Their Preference for Requirements Contracts...............16

       C.    The Parties Entered into a Five-Year Requirements Contract............18

              1.    Precise Requested a Five-Year Agreement ..............................18

              2.    RBC Offered Precise a Five-Year Requirements Contract ......20

              3.    Precise Accepted RBC's Offer for a Five-Year Requirements Contract...............................23

       D.    Precise Breached Its Five-Year Requirements Contract with RBC....26

SUMMARY OF ARGUMENT ...........................................27

ARGUMENT ...................................................................................................29

I.   The District Court Erred in Overturning the Jury's Verdict and Granting
     Precise Judgment as a Matter of Law on a Ground Not Even Raised by
     Precise ................................................................................................29

     A.   The District Court Has a Heavy Burden to Overturn the Jury's
          Findings and May Not Do So *Sua Sponte* Except to Prevent
          Manifest Injustice ...............................................................................29

     B.   The District Court Granted Judgment as a Matter of Law Without
          Satisfying Either the Usual Strict Rule 50(b) Standard or the Even
          Stricter Manifest Injustice Standard .....................................................33

          1.   The District Court Applied the Wrong Standard ......................33

          2.   The District Court Improperly Required "Magic Terms" to
               Enter into a Requirements Contract ..........................................35

          3.   The Jury Was Entitled to Draw Inferences in RBC's Favor
               from the Extrinsic Evidence Surrounding the Offer ................38

          4.   The District Court Made Credibility Determinations ..............42

          5.   This Court's Precedent Mandates Reversal ..............................45

II.  The District Court's Conditional Grant of a New Trial Was Also Reversible
     Error ...................................................................................................47

     A.   The District Court Is Held to a Strict Standard When Disregarding the
          Jury's Verdict and Ordering a New Trial Because the Verdict Is
          Against the Weight of the Evidence .....................................................48

     B.   The District Court's Ruling Granting a New Trial Did Not Satisfy the
          Legal Standards ...................................................................................51

     C.   This Court Should Reinstate the Jury Verdict .......................................55

CONCLUSION .............................................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AMW Materials Testing, Inc. v. Town of Babylon*,
   584 F.3d 436 (2d Cir. 2009) ...................................................29, 30

*Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*,
   58 F.3d 1227 (7th Cir. 1995) ...............................................................36

*Binder v. Long Island Lighting Co.*,
   57 F.3d 193 (2d Cir. 1995) ...............................................................53, 54

*Burger King Corp. v. Horn & Hardart Co.*,
   893 F.2d 525 (2d Cir. 1990) ...............................................................39

*Cash v. Cnty. of Erie*,
   654 F.3d 324 (2d Cir. 2011) .....................................29, 30, 46, 55

*Ceredo Mortuary Chapel, Inc. v. United States*,
   29 Fed. Cl. 346 (1993) .........................................................................36

*Cross v. New York City Transit Auth.*,
   417 F.3d 241 (2d Cir. 2005) ...............................................................29, 35

*Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*,
   34 F.3d 1148 (2d Cir. 1994) ...............................................31, 42, 46

*In re Delphi Corp.*,
   394 B.R. 342 (S.D.N.Y. 2008) ...........................................................37

*DLC Mgmt. Corp. v. Town of Hyde Park*,
   163 F.3d 124 (2d Cir. 1998) ...............................................................49, 50

*Elyse v. Bridgeside Inc.*,
   367 F. App'x 266 (2d Cir. 2010) .......................................................49

*Essco Geometric v. Harvard Indus.*,
   46 F.3d 718 (8th Cir. 1995) .................................................................37

*Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*,
   540 F.3d 133 (2d Cir. 2008) ...............................................................54

iv

*Green v. City of New York*,
    359 F. App'x 197 (2d Cir. 2009) ...............................................................52, 54

*ING Global v. United Parcel Serv. Oasis Supply Corp.*,
    757 F.3d 92 (2d Cir. 2014) ...........................................................*passim*

*James v. New York Racing Ass'n*,
    233 F.3d 149 (2d Cir. 2000) ...............................................................53

*Jorgensen v. York Ice Mach. Corp.*,
    160 F.2d 432 (2d Cir. 1947) ...............................................................48

*Kirsch v. Fleet Street, Ltd.*,
    148 F.3d 149 (2d Cir. 1998) ...............................................................32

*Koch Hydrocarbon Co., a Div. of Koch Indus. v. MDU Res. Grp., Inc.*,
    988 F.2d 1529 (8th Cir. 1993) ...............................................................36

*Kosmynka v. Polaris Indus., Inc.*,
    462 F.3d 74 (2d Cir. 2006) ...............................................................48

*Lore v. City of Syracuse*,
    670 F.3d 127 (2d Cir. 2012) ...............................................................30, 31

*Maureen Christensen v. Cnty. of Dutchess, N.Y.*,
    548 F. App'x 651 (2d Cir. 2013) ...............................................................50

*McClary v. Coughlin*,
    87 F. Supp. 2d 205 (W.D.N.Y. 2000), *aff'd sub nom. McClary v.*
    *Kelly*, 237 F.3d 185 (2d Cir. 2001) ...............................................................49

*Mealey v. Apartment Rentals*,
    125 F.3d 844 (2d Cir. 1997) ...............................................................46

*Piesco v. Koch*,
    12 F.3d 332 (2d Cir. 1993) ...............................................................30

*Provost v. City of Newburgh*,
    262 F.3d 146 (2d Cir. 2001) ...............................................................32

*Raedle v. Credit Agricole Indosuez*,
    670 F.3d 411 (2d Cir.) *cert. denied*, 133 S. Ct. 789 (2012)........................*passim*

*Rodick v. City of Schenectady*,
  1 F.3d 1341 (2d Cir. 1993) ...................................................32, 35

*Rothstein v. Carriere*,
  373 F.3d 275 (2d Cir. 2004) ........................................................32

*Samuels v. Air Transport Local 504*,
  992 F.2d 12 (2d Cir. 1993) ....................................................31, 46

*Sorlucco v. New York City Police Dep't*,
  971 F.2d 864 (2d Cir. 1992) ...................................................53, 55

*Stampf v. Long Island R. Co.*,
  761 F.3d 192 (2d Cir. 2014) ........................................................47

*Thomas v. O'Brien*,
  539 F. App'x 21 (2d Cir. 2013) ..................................................46

*Thompson v. Gjivoje*,
  896 F.2d 716 (2d Cir. 1990) ........................................................39

*Tolbert v. Queens Coll.*,
  242 F.3d 58 (2d Cir. 2001) .........................................................45

*U.S. v. Cote*,
  544 F.3d 88 (2d Cir. 2008) .........................................................52

*United States v. Landau*,
  155 F.3d 93 (2d Cir. 1998) .........................................................39

*Upsher-Smith Labs., Inc. v. Mylan Labs., Inc.*,
  944 F. Supp. 1411 (D. Minn. 1996)..............................................36

**Statutes and Rules**

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1332 ...........................................................................1

Conn. Gen. Stat. § 42a-1-201(3)....................................16, 36, 38

Conn. Gen. Stat. § 42a-1-303.................................................16, 38

Conn. Gen. Stat. § 42a-2-201 cmt. 1 ...........................................38

Conn. Gen. Stat. § 42a-2-202 .................................................................38

Conn. Gen. Stat. § 42a-2-202 cmt. 2 ......................................................38

Conn. Gen. Stat. § 42a-2-204 .......................................................16, 36, 38

Conn. Gen. Stat. § 42a-2-204 cmt. 1 ......................................................38

Conn. Gen. Stat. § 42a-2-206 .................................................................16

Conn. Gen. Stat. § 42a-2-306(1) ............................................................35

Fed. R. Civ. P. 50(a) ........................................................................*passim*

Fed. R. Civ. P. 50(b) ........................................................................*passim*

Fed. R. Civ. P. 50 .............................................27, 29, 32, 38, 54

Fed. R. Civ. P. 54(b) ...............................................................................1

Fed. R. Civ. P. 59(a)(1)(A) ....................................................................48

Fed. R. Civ. P. 59(d) .........................................................................48, 54

Fed. R. Civ. P. 59 .............................................................................*passim*

## Other Authorities

Moore's Federal Practice 3d ............................................................33, 49

# JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1332, as RBC Aircraft Products, Inc. ("RBC") is a Delaware corporation with its principal place of business in Connecticut, and Precise Machining and Manufacturing, LLC ("Precise") is an Oklahoma limited liability corporation with its principal place of business in Oklahoma.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court's May 29, 2014 opinion and order set aside the jury's verdict in RBC's favor finding that Precise breached a five-year requirements contract and granted judgment as a matter of law for Precise on that claim. The opinion and order allowed RBC to pursue instead, at a new trial, only an alternative claim of breach of a one-year purchase order along with Precise's counterclaim for breach of the same order, which had been rendered moot by the jury's verdict but were revived by the court's order. ECF#255 at 48. Because trial of this alternative one-year claim would be unjust and inefficient before appellate review of the principal five-year claim thrown out by the district court, that court entered a final judgment on the claim for breach of a five-year requirements contract on August 11, 2014, pursuant to Fed. R. Civ. P. 54(b), stating that "there is no just reason for delay." ECF#267. RBC timely appealed on August 14, 2014.

## ISSUES PRESENTED FOR REVIEW

1.      In this case governed by the UCC, the district court repeatedly ruled that the issue whether the parties had formed a five-year requirements contract, and whether Precise had breached it, were disputed issues for the jury, and the jury then returned a verdict for RBC that Precise had entered into and breached a five-year requirements contract. The district court nevertheless set aside the verdict for RBC and entered judgment as a matter of law under Rule 50(b) in favor of Precise on a ground never raised by Precise in its own Rule 50(b) motion and admittedly raised *sua sponte* by the court well after the jury had returned its verdict. Did the district court err in making its own, *sua sponte* determination that RBC had not used sufficiently detailed requirements contract language, where:

      (a) there was sufficient, indeed abundant, evidence from which a fact-finder could conclude the parties entered into a five-year requirements contract;

      (b) the court improperly reassessed the evidence and failed to credit the jury's credibility determinations and instead made its own assessments of party intent despite the UCC's requirement that the fact-finder weigh all surrounding facts and circumstances and the court's own recognition of the evidence weighing on both sides of the issue; and

      (c) granting judgment to Precise in this commercial dispute involving factual questions of party intent did not come close to satisfying the exceptional

standard of preventing "manifest injustice" to justify granting judgment as a matter of law on a ground not raised by the defendant?

2.    Did the district court err when conditionally ruling that even if its Rule 50(b) *sua sponte* grant of judgment to Precise is reversed on appeal, the verdict should nevertheless be set aside for a new trial as against the weight of the evidence (an issue not raised by Precise in its Rule 59 motion), where the court usurped the function of the jury and tied its Rule 59 ruling to the same impermissible overruling of the jury's resolution of a disputed issue as in its Rule 50(b) ruling?

## STATEMENT OF THE CASE

### I.    Introduction

This case began as an ordinary contract dispute where both parties agreed they had a requirements contract; they just disagreed over its length.   RBC contended that the parties executed a five-year requirements contract for the purchase and sale of highly specialized cam follower bearings, while Precise contended that the parties entered into a purchase order for only one year's worth of Precise's requirements.   Neither party disputed—at any phase in this case—that they had a requirements contract, and Precise never raised the issue that the district court raised *sua sponte* after the jury's verdict in RBC's favor.

The parties tried their claims to the jury over seven days.   Consistent with the Uniform Commercial Code ("UCC"), the jury heard direct and extrinsic evidence concerning the intent and meaning of the agreement, including evidence of contract negotiations, exchange of commercial forms, course of dealing, course of performance, and trade usage.   The jury determined that RBC proved a five-year requirements contract that Precise breached, causing RBC $2,986,089 in damages. The jury thereby rejected Precise's primary defense that its purchase order (containing orders for only one year's worth of requirements) was the offering document in this quote and purchase order case, finding instead that RBC's Quote

4

was an offer to enter into a five-year requirements contract that Precise then accepted through the issuance of its purchase order.

This case should have ended with a judgment for RBC in accordance with the jury's verdict. But during oral argument on Precise's post-verdict motion, the district court—in its own words—threw a "curve-ball" at RBC. Despite having previously ruled (in denying Precise's summary judgment and Rule 50(a) motions) that this was a jury case, and that the jury should decide (as it did) whether the parties had a five-year or one-year requirements contract, the court questioned whether there was a requirements contract at all and asked the parties to brief this issue it was raising *sua sponte*. Although Precise had never raised the issue, the court granted judgment to Precise, finding that invoking this truly extraordinary relief was necessary to prevent manifest injustice in what was otherwise a routine contract dispute under the UCC.

There is no precedent in this Court for that extreme relief in this type of routine commercial matter involving classic jury issues. To justify its ruling, the district court disregarded RBC's evidence and testimony and displaced the jury's credibility determinations. Indeed, it displaced the jury entirely, sitting as a one-sided fact-finder after jury deliberations were complete. The court even addressed what should happen if it is reversed on appeal, ruling that it would nevertheless still require a new trial under Rule 59 because the verdict was against the weight of

5

the evidence. The court made that new trial ruling for the very same reasons it had granted judgment to Precise as a matter of law. This Court should reverse and reinstate the jury's verdict.

## II.    Procedural History

### A. The Lawsuit and Verdict

RBC brought suit for Precise's breach of a requirements contract for bearings used in Boeing 737 wing assembly kits made by Precise. ECF#1 at 6.[1] The case was assigned to the Hon. Stefan R. Underhill. Precise answered and asserted a two-count counterclaim against RBC claiming that RBC did not fulfill the 2009 purchase order for the first year of its requirements in 2010. ECF#10.

Precise's theory of the case has been the same since moving for summary judgment. Precise has never disputed the existence of terms in RBC's June 2009 offer that, if accepted by Precise's purchase order, would make it a multi-year requirements contract. Rather, Precise has tried to avoid that issue altogether by arguing instead that RBC's June 2009 offer was not technically an offer at all under the UCC. Precise argued that, as a matter of law, its July 2009 purchase order (which did not expressly contain requirements language) was the offer.

---

[1] RBC also brought promissory estoppel and unjust enrichment claims related to its breach of contract claims. ECF#1 at 6-8. Further, in the alternative, RBC alleged breach of a one-year agreement between RBC and Precise based on Precise's purchase order for the first year of its requirements under the multi-year deal, as well as related promissory estoppel and unjust enrichment claims. *Id.* at 8-10.

ECF#87 at 13. Precise has further claimed that RBC's offer was incapable of forming a contract if accepted because the offer was on a preprinted form that (in Precise's view) made any contract conditional on RBC home-office approval. *Id.* at 16. Precise never argued that RBC's offer, if a valid offer, did not contain terms sufficient to create a five-year requirements contract. Indeed, portions of Precise's argument have even assumed that RBC's offer was for a five-requirements contract. *E.g.*, *id.* at 22 (noting that while RBC offered "the 100% volume term . . . [Precise] did not accept that term"); *id.* at 22-23 ("Whether a buyer is bound by a five-year 'requirements' obligation is obviously 'material,' not 'minor,' and *the conflict on that issue between the Quote and the Purchase Order* prevents the latter document from being construed as an acceptance.") (emphasis added).

On the contract interpretation issues raised by Precise, the district court was clear that there were disputed fact issues for the jury. As the court stated during oral argument on Precise's summary judgment motion:

> [O]n the motion for summary judgment with respect to the breach . . . of contract claims . . . if I look at the evidence in the light most favorable to the plaintiff [RBC], the plaintiff clearly wins. [T]hey literally win . . . on liability.
>
> So it's not a question, it's not even a close question whether a jury could find in their [RBC's] favor. A jury would find in their favor if you look at the evidence in the light most favorable to them. Precise's best hope is that the jury doesn't look at the evidence in the light most favorable to RBC. That's the only way that Precise can prevail at trial.

ECF#126 at 17:22-18:13. After hearing argument, the court denied summary judgment, ruling from the bench that "[t]here is clearly evidence in the record from which a fact finder could find the existence of a five year requirements contact." ECF#126 at 26:13-15.

The parties tried this case to a jury over seven days. ECF##175, 187. After RBC rested its case, Precise moved for judgment as a matter of law under Rule 50(a) and later reasserted its Rule 50(a) motion after the close of evidence. ECF##178, 183. The district court twice denied relief under Rule 50(a). ECF##179, 184. Its oral rulings rested on the same grounds: the issue of whether there was a contract and its terms were for the jury (not the court) to decide. *See* ECF#204 at 729:11-17 ("[T]here is evidence from which a jury could find that the quote and the purchase order formed a contract for a requirements contract of up to five years . . . this really is a jury issue."); ECF#210 at 1295:7-8 (summarily denying motion for judgment as a matter of law because "this is definitely a jury case").

The jury then rendered a verdict in favor of RBC, finding the following:

**Breach of a 5-year requirements contract**

> **Question 1:**     Has RBC proven by a preponderance of the evidence that Precise and RBC entered into a 5-year requirements contract?
>
>                 Yes <u>X</u>        No ___
>
> **Question 2:**     Has RBC proven by a preponderance of the evidence that Precise breached this 5-year requirements contract?
>
>                 Yes <u>X</u>        No ___

ECF#191.  It awarded RBC $2,986,089 in damages, with the word "Full" (likely a reference to full requirements or full damages, and underlined twice by the jury) written by the jury onto the verdict form.  *Id.*

Precise then renewed its motion for judgment as a matter of law under Rule 50(b) and for a new trial, relying on many of the same arguments it had previously made in its summary judgment motion and under Rule 50(a).  ECF#195; ECF#226. Precise *never* argued that the terms of RBC's offer were not for a five-year requirements contract—not on summary judgment or in either the Rule 50(a) or 50(b) motions.  *Id.*   Rather, Precise continued arguing that its purchase order was the offering document as a matter of law.  *Id.*

On July 19, 2013, the district court held oral argument on Precise's post-verdict motions.  ECF#247.  During argument, the court raised *sua sponte,* and for the first time, an entirely new issue: whether the June 8, 2009 offer was for a requirements contract.  The court stated that, in its opinion, the "interesting"

question was whether "this [is] a price quote as opposed to a requirements contract?" ECF#253 at 12:17-25. Because this was an issue that had never before been raised in this litigation, it was not even immediately clear what the court meant, although its later Ruling (discussed in the next section) explained it. When counsel noted that the court had denied the summary judgment and Rule 50(a) motions on these issues of contract interpretation in favor of submitting them to the jury, the court responded:

> Denying summary judgment, denying a Rule 50 motion is common. Why? *Because you think the jury's going to do the right thing.* So, the fact that those motions were denied doesn't somehow bar me[.]

ECF#253 at 19:16-19 (emphasis added).

The court recognized that it was raising this issue *sua sponte*. *See* ECF#253 at 27:4-5 ("I raised it, why don't you give me a brief opposing it?"). It allowed the parties further briefing on this question, saying, "I'll be completely frank. I realize I'm throwing you a little bit of what amounts to a curve ball." ECF#253 at 27:17-19.

Unsurprisingly, Precise followed the district court's lead, arguing for the very first time in this litigation that "the Court's concern is well taken," ECF#249, at 2, and that RBC's offer was not for a five-year requirements contract, but rather a price quote.

10

## B. The District Court's Ruling

In its May 29, 2014 ruling on post-verdict motions (ECF#255 or "Ruling"), the district court granted judgment as a matter of law in favor of Precise on the issue it had raised *sua sponte* and was not found in Precise's Rule 50(b) motion. It found that judgment had to be directed for Precise, and that the jury's verdict in this ordinary commercial dispute had to be ignored, to prevent manifest injustice. Significantly, the court rejected each of the arguments that Precise had raised on its own in its Rule 50(a) and 50(b) motions, only to still grant Precise judgment as a matter of law.

The court began by recognizing that the plain language of the parties' agreement was ambiguous. ECF#255 at 43-44. According to the court, it was "conceivable" that under the agreement's plain language, RBC offered to enter into a five-year requirements contract, which Precise accepted. *Id.* at 43. Nevertheless—in a complete reversal from its earlier rulings that the terms of the contract were a reasonably disputed issue of fact for the jury to decide[2]—the court found that no reasonable jury could have found in favor of RBC. The court provided its own interpretation of RBC's offer as a five-year price quote that did

---

[2] *See* ECF#126 at 26:13-14 ("There is clearly evidence in the record from which a fact finder could find the existence of a five year requirements contract."); ECF#204 at 729:16-17 ("[T]his really is a jury issue[.]"); ECF#210 at 1295:7-8 ("[T]his is definitely a jury case.").

11

not entail any reciprocal obligation by Precise to "obtain its requirements exclusively from RBC for five years." ECF#255 at 47.

After the district court reassessed the evidence, it found that "first, and foremost," Precise's policy was not to enter into long-term agreements, such as a multi-year requirements contract. *Id.* at 44. In reaching this conclusion, the court relied exclusively on the testimony of Precise's witnesses and defense exhibits. *Id.* Although Precise, of course, did enter into a multi-year requirements contract with Accurate in 2010 (RBC's competitor and successor to the Precise business, *see infra* at 26-27), the court ignored this fact and found it be of "no bearing." *Id.* at 44 n.16.

Second, the court found that Precise had repeatedly told RBC that it would not enter into any kind of long-term agreement with its suppliers. *Id.* at 45. The court therefore concluded that "RBC had no reason to believe that it could get Precise to accept a binding five-year requirements contract—a long-term agreement—through the back door of the [purchase order] process." *Id.* at 46.[3]

---

[3] The district court ignored its factual findings a few pages earlier that RBC employees *did* believe that they had entered into a five-year requirements contract through the quote and purchase order process. *E.g.*, *id.* at 10 ("[An RBC employee] recalled thinking that RBC had 'won' the business for five years, because the [purchase order] incorporated the prices from RBC's quote"); *id.* at 15 ("[An RBC employee] replied that RBC's price quotation clearly stated that its five-year pricing was in exchange for 100% of Precise's volume for five years.").

12

Third, according to the court, RBC did not clearly tell Precise that its five-year pricing was conditioned on Precise entering into a five-year requirements contract. *Id.* at 46. Yet, at the same time, the court recognized that RBC's witnesses had testified to the contrary at trial. *Id.* And it never cited those portions of the trial record where Precise's own witnesses conceded that RBC's offer was for 100% of Precise's business. Instead, the court relied on out-of-context testimony and exhibits to support its own theory of the case. *Id.* According to the court, "[t]his interpretation is reasonable." *Id.* at 46 n.17.

Fourth, the court found that RBC did not dispute at trial that Precise had not interpreted its offer as one to enter into a five-year requirements contract. *Id.* According to the court, and contrary to the trial evidence (*infra* at 22-25), even if RBC had intended to offer a requirements contract through its June 8, 2009 offer, RBC offered no evidence at trial—and did not dispute—that Precise did not have the same understanding. *Id.* at 47. The court concluded that no reasonable jury could have found that Precise promised to obtain its requirements exclusively from RBC for five years. *Id.* It therefore found that "manifest injustice" would result if the jury verdict was not vacated. *Id.* at 47 n.18.

In the alternative, and again without prompting by Precise in any filed motion, the court ruled that Precise was entitled to a new trial under Rule 59 based on the same reasoning, because the verdict was (in the court's own view) against

13

the manifest weight of the evidence. The court issued this contingent ruling in the event its granting of judgment to Precise is reversed on appeal. *Id.* at 48.

## III.   The Trial Record

After a seven-day trial, the jury found that RBC had proven that Precise breached a five-year requirements contract and awarded RBC contractual damages of $2,986,089. ECF#191. In reaching this verdict, the jury reasonably could have credited the following facts.

### A. RBC and Precise Were Part of the Boeing 737 Supply Chain

RBC and Precise were component suppliers on the Boeing 737 supply chain. RBC manufactured highly specialized cam follower bearings in accordance with Boeing specifications. Ex.116. These bearings—referred to at trial as the size 18s and 20s—were suitable for use only in Boeing 737 aircraft. Tr.51-52. RBC sold the bearings to Precise, and Precise incorporated them into wing assembly kits that it manufactured and sold to Spirit Aerosystems ("Spirit"). Tr.893-94. Spirit, in turn, made entire wing sections and sold them to Boeing for installation on the 737 aircraft. Tr.58.

Exclusive supply arrangements whereby a manufacturer purchases all of its requirements from one supplier are fairly common in the aerospace industry, Tr.537-41, 771-72, 937, 1067, and they permeated the Boeing 737 supply chain at issue in this case. From 1995-2009, Precise purchased all the cam follower

14

bearings it needed exclusively from RBC and RBC's predecessors in interest. Tr.86. Precise, in turn, maintained its own exclusive relationship with Spirit and, for nearly two decades, Precise was the exclusive supplier of wing assembly kits placed on Boeing 737 aircraft. Tr.744, 893-94. That is, Spirit purchased all of its requirements for wing assembly kits directly from Precise. Tr.1018; Tr.760.

Precise's historic $1 million in annual bearings orders was anchored by steady demand for new 737 aircraft. Tr.71-72, 610-11, 1023-26. By the time of trial in 2013, production of new Boeing 737 aircraft had steadily increased from 1995, enabling Precise to make more wing assemblies than it had in in 2010. Tr.1024-25; *see also* Tr.275 (Boeing increasing aircraft production from 31 to 38 planes per month).[4] In fact, notwithstanding cost pressures that all manufactures face, Precise made $14.5 million in annual sales on the Boeing 737 line of work and had $22 million in overall annual sales within the aerospace industry. Tr.844-45, 907.[5]

---

[4] In its Ruling, the district court painted a dismal picture of the aerospace market that was fundamentally at odds with the evidence and testimony presented mainly from Precise's own witnesses.

[5] The district court's Ruling depicted Precise as an unsophisticated party outmatched by RBC's experience. The Ruling left that impression notwithstanding Precise's $22 million in annual sales, production of sophisticated aerospace parts, a newly renovated $4 million dollar facility, a stand-alone purchasing department, an executive team, approximately 160 employees, and 15 years of experience in the market as an exclusive player on the attractive Boeing 737 work. Tr.765-67, 844-45, 907; Ex.11. Put differently, Precise is not a mom and pop operation.

### B. The Parties' Five-Year Course of Dealing and Their Preference for Requirements Contracts

Based on the evidence, all of a type that a jury may consider in a case governed by the UCC, the jury could have reasonably relied on the parties' five-year course of dealing, preference for requirements contracts, and business environment in reaching its verdict. *See* Conn. Gen. Stat. §§ 42a-1-201(3), 42a-1-303, 42a-2-204, 42a-2-206. During this five-year period, RBC and Precise worked together under mutually dependent and beneficial business conditions. Tr.58, 772. Precise valued RBC as a trusted supplier of the highly specialized bearings. Tr.772. Apart from supplying Precise with air-worthy bearings, RBC regularly adjusted delivery and production schedules in accordance with Precise's actual bearings demands. Exs.206, 25, 44. And, where appropriate, the parties executed revised purchase orders that reflected Precise's fluid orders for bearings. *Id*.

The parties' relationship was not only amicable, it was exclusive. Their five-year course of dealing was for Precise to acquire all of its bearings requirements solely from RBC. Tr.758-59; Ex.205. Precise's executives even used the word "requirements" when describing Precise's historic approach with RBC. Tr.759-60 ("The typical flow would be that the buyer and the salesperson from the RBC side would talk about *requirements* . . . ."); Tr.758 (Precise would "*release purchase orders on an annual basis* that would generally carry about *12 months' worth of requirements*"); Tr.857-58 (Precise would order its supplies

16

based on "*requirements*"); *see also* Ex.205 (RBC emailing Precise that its 2007 prices were "for the quantities Boeing gives to you and no more").

After working out the price, delivery, and payment terms through emails with RBC, Precise historically ordered a year's worth of its bearings requirements and, where needed, revised orders to reflect Precise's changing production needs. Ex.207. Precise historically placed orders with RBC in the spring—and always for the next year's bearings requirements. Tr.760 ("A. Yes, these were considered to be very long lead parts, kind of complex, and so we would try to give RBC enough time to get their *requirements* in place and get the pricing in place so we could stay out ahead of Spirit's *requirements*."); Ex.81 (Precise referring to its order as the "*2010 requirements*"); Ex.82 (Precise referring to its order as the "*2010 requirements*"); Ex.250 (Precise referring to its order as the "*2010 requirements*").

The parties contracted informally for several years, preferring business expediency over lawyerly niceties. Ex.207. And while RBC occasionally approached Precise with proposals for a long-term contract, suggesting cost savings and economies of scale, Precise stood by its historic position that it would order parts from RBC on an annual requirements basis, a position that RBC respected. Tr.57-58.

However, in May 2009—as the 2010 requirements season neared—Precise effected a change in the parties' contracting practices. Tr.58-62, 858-59. For the

17

first time in their longstanding relationship, Precise asked RBC for a long-term, five-year proposal that included Precise's requirements through December 2015. Tr.60-61, 858-59.

### C. The Parties Entered into a Five-Year Requirements Contract

#### 1. Precise Requested a Five-Year Agreement

In the spring of 2009, Spirit (Precise's customer) asked Precise for a five-year proposal that included reduced prices on Precise's $14.5 million Boeing offering. Tr.60-62, 858-59. While RBC's bearings were only two parts out of 160 products that Precise sold to Spirit, Tr.907, Precise, in turn, made a similar request of RBC for a five-year proposal, and a corresponding price reduction, for deliveries through 2015. In other words, for the first time in their history, Precise wanted a multi-year requirements contract with RBC. Ex. 2; Tr.755, 856, 986, 1029.

On May 5, 2009, the parties met in Tulsa, Oklahoma at Precise's newly renovated $4 million facility. Tr.58-62, 765-67. The purpose of the meeting was for RBC to consider Precise's multi-year request. Exs.10, 11. Consistent with their past practice of requirements contracts, RBC's executives maintained that they could only sell the bearings at the reduced price requested by Precise if RBC received all of Precise's bearing requirements over the same five-year period. Tr.63-64, 130-31, 387, 984.

18

At the meeting, RBC also made Precise aware of its concerns about Precise buying bearings from RBC's competitor, Accurate Bearing Company ("Accurate"), that is, "splitting the business" between RBC and Accurate. Tr.934; *see also* Tr.984 ("Q. . . RBC was concerned that Precise would split the business between RBC and Accurate, correct? A. Right."); Tr.984 ("Q. Okay. And so during this May 5, 2009 meeting you were aware of that concern, correct? A. Correct, yes."). Accurate was a Boeing-approved supplier on the 737 business and could manufacture bearings comparable to RBC's bearings. Tr.766-67.

To address this concern, RBC stated at the May 5 meeting that it needed "100 percent" of Precise's bearing requirements through December 2015, otherwise RBC could not offer the steep twenty-percent discount that Precise wanted. Tr.63-64, 984. Some of Precise's witnesses who attended the May 5 meeting corroborated RBC's account of the meeting, including how RBC made clear it would only make an offer for *all* of Precise's bearing requirements. Tr.984. Another Precise witness testified similarly before trial (*i.e.*, that RBC expressed a desire to maintain "100 percent" of the business), but changed his earlier testimony when questioned by Precise's counsel at trial. On cross-examination, this flip-flop at trial was exposed, and Precise's witness admitted to changing his testimony after meeting with Precise's counsel. Tr.1081-82.

The district court sought to support its conclusion that it is not possible that Precise would enter into a long-term requirements contract by referring to the fact that RBC "hand[ed]" a sample multi-year agreement to Precise at that meeting, which Precise rejected. Ruling, ECF#255, at 6-7. However, RBC witnesses testified at trial that they did *not* bring any draft contracts, let alone a detailed long-term agreement, to the May 5 meeting. Tr.384, 130-31.[6] Thus, this was a disputed issue, part of the mix of evidence for the jury to sort out.

No agreements were reached during their May 5 meeting. Tr.61-64. The meeting concluded with RBC agreeing to run the numbers and make Precise an offer. Tr.68-72.

## 2. RBC Offered Precise a Five-Year Requirements Contract

On June 5, 2009, RBC offered Precise a five-year requirements contract. RBC put its offer in writing not once but twice. Exs.1, 20. Precise—a sophisticated $14.5 million operation with a fully staffed purchasing department—was free to accept RBC's offer or go elsewhere. Tr.927. As shown below, and as found by the jury, Precise accepted RBC's offer.

---

[6] On page 6 of its Ruling, the court cited to page 62 of the transcript, but that testimony does not refer to a sample contract at that meeting. In fact, there is evidence that RBC was at the time of that meeting still trying to understand Precise's request. *Id.*; *see also* Tr.61-65.

RBC twice conveyed its written offer to Precise. First, respecting Precise's aversion toward lawyerly written documents, RBC issued a formal one-page offer instead. Ex. 1; Tr.227. RBC styled the offer as a formal Quote, something it had not done before with Precise, as they had transacted business mainly over email. Ex.19. The district court concluded that RBC's Quote was sufficiently detailed to legally constitute an offer. ECF#255 at 30-33; *see* Ex.1.

Second, wanting to place special emphasis on its offer, RBC sent a separate email to Precise cutting and pasting the terms of its offer into the email. *Compare* Ex.1 *with* Ex.20. RBC then made phone calls to Precise's purchasing manager before ***and*** after it sent the offer, all to make sure Precise was clear that RBC was offering a five-year requirements contract. Tr.387, 394-95.

The requirements contract provision in RBC's offer read as follows:

**FOR DELIVERIES THROUGH 12-31-2015 PRICING IS SUBJECT TO 100% OF THE VOLUME THAT PRECISE HAS TO BUY DURING THIS PERIOD**

[and]

**Quantity From 1 To 9,999**

Ex.1 (all caps in original) (emphasis added). Consistent with RBC's stated position at the May 5 meeting, its offer was contingent upon RBC receiving 100% of Precise's requirements through **"12-31-2015"** and RBC was offering "**DELIVERIES**" through December 31, 2015 "**SUBJECT TO**" RBC obtaining

21

**"100% OF THE VOLUME"** of bearings that Precise needed for the wing assembly kits it produced. Ex.1.[7]

When asked about this specific language in RBC's offer, Precise's Jeff Greer testified that Precise understood it to mean that RBC was offering Precise specially reduced prices contingent upon RBC having all—or 100 percent—of Precise's bearings orders through December 2015. Tr.855 ("Q. Okay. So they are asking for deliveries through 12/31/2015, right? A. Correct. Q. And they are asking for 100 percent of Precise's business during that period of time, right? A. Yes."); *see also* Tr.856 ("Q. RBC is asking for 100 percent of the volume through 2015, right? That's what they want? A. In this quotation there's a term that asks for that.").

Although the district court searched for confusion among Precise's witnesses, the jury was free to credit this testimony from Precise's main witness, Jeff Greer, that Precise understood RBC's offer to include a five-year requirements term. And if that testimony was not enough (which it was), the jury was

---

[7] The district court's Ruling made much of the fact that RBC specially typed the "all caps" requirements provision in its offer. If anything, the fact that RBC specially typed the terms under which it was willing to do business with Precise illuminates that RBC wanted to be clear, in yet another way, that it was offering a five-year requirements contract in light of Precise's special request for reduced-price bearings by twenty percent over the same five-year period included in RBC's offer.

additionally free to credit testimony from RBC's witnesses that the language in its offer, Ex.1, was intended as an offer for a five-year requirements contract:

- Tr.76 ("Q. Could you explain for the ladies and gentlemen of the jury what the quantity, one to 9,999 means? A. Basically we were agreeing we would supply all the products . . . . They could order any quantity they want for any delivery schedule between now and December 31st, 2015, as long as they agreed to buy hundred percent of whatever they were buying from us.") (Bannon testifying).

- Tr.80-81 ("Q. Mr. Bannon, what does this quote [Exhibit 1] represent? A. This quote is an offer to Precise that they can buy any demand they have through the period of 2015 for those two prices, $89 and $91, as long as they commit to giving us 100 percent of the business that they have during that period of time. Q. And that period is that again, remind me? A. For all deliveries through 12/31/2015.") (Bannon testifying).

- Tr.384-85 ("Q. Okay. And when you say 'volume,' for us laypeople, can you just describe what you mean by the term 'volume'? A. Sure. It's the quantity of the bearings that were going to be needed during that time period." (Christiano testifying).

As testimony from both sides demonstrates, there was no dispute that RBC's offer included a provision for a five-year requirements contract, further explaining why Precise's team of lawyers never challenged it as such in this case.

### 3. Precise Accepted RBC's Offer for a Five-Year Requirements Contract

While Precise had other options, it accepted RBC's offer. As was its practice, Precise accepted RBC's five-year requirements contract offer by placing its purchase order in July 2009 against RBC's quote. Ex.2. Indeed, Precise included in its purchase order the same specially reduced prices that RBC included

in its offer, made contingent upon having all of Precise's requirements through December 2015. Ex. 2; Tr.84-85, 243, 394-95. Believing that RBC had "won" all the work, RBC started manufacturing the 2010 installment of Precise's bearing requirements, which Precise adjusted twice along the way (as it had in the past) by issuing revised purchase orders that increased and decreased its bearings needs. Tr.394-95; Ex.25 (Precise's Revised Purchase Order issued in August 2009 increasing Precise's 2010 requirements to $837,088 at the specially negotiated price of $89 and $91 per bearing); Ex.44 (Precise's Revised Purchase Order issued in January 2010 decreasing Precise's 2010 requirements to $809,728 at the specially negotiated price of $89 and $91 per bearing). At no point after receiving RBC's quote, and before Precise accepted it in July 2009, did Precise express any objection to the terms contained in it. Tr.394-95, 841.

That Precise had agreed to purchase 100% of its requirements from RBC is confirmed by the fact that Precise repeatedly acknowledged to RBC—and the jury—that it never intended "to split" its cam follower orders. Tr.986-87, 1030. Rather, Precise just needed to decide whether it was going to award this long-term bearings contract to RBC or Accurate on an "all" or "nothing" basis, that is, as the sole source for its bearings requirements through December 2015. Tr.986-87, 1030.

24

Precise's testimony that it was never "our intention to ever split" its bearings business—relegated to a footnote in the district court's Ruling—is additional evidence the Jury could have credited (and did) in reaching its verdict that the parties entered into a five-year requirements contract.   Ruling at 46 n.17   As Precise's Phil Miller testified:

- Tr.1030 ("Q. Okay. And do you recall if there was any assurance to RBC that Precise doesn't split their business; they just go with who's got the best pricing?  A. In that, in that May meeting, I had said it was not our intention to ever split, that we had no reason to.").

- Tr.986-87 ("Q. Okay. And you were going to either go with Accurate or you were going to go with RBC, right?  A. Solely, yes.  Q. Okay. And RBC, you know RBC wanted to keep all of the business, right?   A. Yes, yes, definitely").

- Tr.987 ("Q. And if Precise went with Accurate, RBC wouldn't be able to keep all of the business, right?  A. They would get nothing.  Q. They would get nothing?  A. Right.").

The court's selective discussion of the evidence cannot replace the jury's right to rely on this record as additional evidence from Precise that it wanted a long-term contract "solely" with RBC or Accurate on an all-or-nothing basis. Indeed, as discussed below, Precise entered into not one—but two—multi-year requirements contracts.  The first was with RBC, the second with Accurate (after breaching RBC's contract), and all notwithstanding Precise's so-called company policy that it does not enter into long-term agreements.  Exs.1, 2, 73; Tr.957-58.

### D. Precise Breached Its Five-Year Requirements Contract with RBC

At one point, Precise asked RBC to grant Precise an extra-contractual discount on older existing orders, and RBC refused. Upset by this, Precise then contacted Accurate in December 2009. Tr.859-61, 868-69; Exs.36, 37, 38. Precise later predicted it could save about $500,000 if it switched its business to Accurate through 2015. Tr.859-63, 868-69, 1011; Exs.35, 47.

Trying to generate support for its litigation theory, Precise at first testified that Accurate provided an "unsolicited" bid in December 2009—but eventually admitted at trial when confronted with emails that Precise, itself, solicited Accurate in December 2009. Tr.1013-15. Having ran the numbers, canvassed Accurate in December 2009, and positioned itself to breach RBC's contract, on April 6, 2010 Precise, unbeknownst to RBC, issued a $1.7 million order with Accurate for comparable bearings from 2010-2012 with options through 2015. Exs.47, 73. Precise then terminated its relationship with RBC on April 30, 2010. Ex.82. As Precise's internal documents reflected, Accurate's prices were just "too good to ignore." Tr.869-71; Exs.47, 55.

Precise's surreptitious order with Accurate was, as Precise's witnesses testified, a multi-year contract—another concession at odds with Precise's

26

litigation defense that it did not enter into multi-year contracts as a matter of company policy.  Tr.875-76; Ex.73.[8]

After Precise terminated the parties' contract, this suit followed.

## SUMMARY OF ARGUMENT

The jury returned a verdict for RBC, finding that Precise entered into, but then breached, a five-year requirements contract.  In this routine commercial dispute governed by the UCC, the jury heard a wealth of evidence from both sides, some conflicting, and did what the district court charged it to do—resolve the conflicting evidence and reach a verdict.  After repeatedly calling this a jury case, the district court nevertheless removed this case from the jury, after the fact, and opined at length on its own view of the evidence, selecting only some of the evidence heard by the jury to support the court's own theory.  The court conceded that it did so on a ground not raised by Precise in any Rule 50 motion, before or after the verdict, and so found that upholding the verdict would be manifestly unjust, allowing it to direct judgment for Precise on a legal theory that Precise itself never thought viable.  Yet, a fair reading of the lengthy and detailed record, which the jury listened to attentively, contradicts the very notion of manifest injustice, which can be invoked only in extraordinary circumstances where a verdict is wholly without any possible support in the record.

_____

[8] The transcript incorrectly refers to exhibit 273, rather than 73.

A fair reading of the district court's own Ruling, let alone of the whole record, shows that this case cannot meet that demanding standard for granting Rule 50(b) relief. The court acknowledged that both parties were credible in their testimony, beliefs, and presentations. After the jury ruled one way (for RBC), the district court determined that the jury did not get it right, and therefore picked a different version of party intent, contract history, and significant events surrounding contract formation that the jury had rejected. The court's grant of judgment as a matter of law cannot be sustained and should be reversed.

The court also addressed the contingency of reversal of its Rule 50(b) ruling and ordered a new trial on the claim of a breach of a 5-year requirements contract on the ground (not raised by Precise in its own Rule 59 motion) that the verdict is against the weight of the evidence. A trial court may not dispense so easily with the jury's verdict in these circumstances, and where the ruling for a new trial is based on the same flawed rationale underlying the grant of judgment as a matter of law, this Court has not hesitated to reverse and reinstate the jury's verdict. It should do so here.

# **ARGUMENT**

### I. The District Court Erred in Overturning the Jury's Verdict and Granting Precise Judgment as a Matter of Law on a Ground Not Even Raised by Precise

#### A. The District Court Has a Heavy Burden to Overturn the Jury's Findings and May Not Do So *Sua Sponte* Except to Prevent Manifest Injustice

This Court reviews *de novo* the district court's decision to grant judgment as a matter of law. *Cash v. Cnty. of Erie*, 654 F.3d 324, 332-33 (2d Cir. 2011). In conducting its *de novo* review, this Court is "bound by the same stern standards" as the district court. *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). Under Rule 50, a court may grant judgment as a matter of law only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Although the burden for a party seeking judgment as a matter of law is always heavy, it is "particularly heavy" when the jury has deliberated and returned a verdict. *Cash*, 654 F.3d at 333 (internal punctuation and citation omitted). To grant a Rule 50(b) motion, there must be so little evidence supporting the verdict that it could only be "sheer surmise and conjecture," or the evidence in favor of the losing party must be so overwhelming that "reasonable and fair minded men could not arrive at a verdict against him." *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 456 (2d Cir. 2009) (internal punctuation and citation omitted).

This Court has refused to allow judgment as a matter of law where there is testimony which a jury could have credited in reaching its verdict. *Id.* at 456-57. Likewise, it has overturned a district court's decision to grant a Rule 50(b) motion even if there is a "close question" about how to weigh the evidence. *Cash*, 654 F.3d at 339. This is because weighing the evidence is a matter for the jury. *Id.* In sum, at this stage, judgment as a matter of *law* cannot be granted based on disputes over a matter of *fact*. *Id.*

As difficult as that standard is for overturning the verdict, the standard is even higher in cases, like this one, where the defendant has not even raised the issue that the district court is considering for directing judgment as a matter of law. Here, Precise failed to raise the ground despite multiple opportunities, and each failure has its own consequences.

After the jury has reached a verdict, a party may move for judgment as a matter of law under Rule 50(b). Fed. R. Civ. P. 50(b). However, a Rule 50(b) motion may only renew arguments raised in a Rule 50(a) motion before the case was submitted to the jury; no new arguments may be added after the jury has rendered its verdict. *Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012). If a party fails to move under Rule 50(a), "[t]he law is pellucid" that this failure "has consequences." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014). This is because the opposing party should have the

opportunity to seek to cure any deficiencies in its evidence before the case is sent to the jury. *Lore*, 670 F.3d at 152. In other words, the requirement that a party move under Rule 50(a) in order to bring a Rule 50(b) motion is no "mere technicality." *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994). Rather, it is an integral part of providing each party a "fair" opportunity at trial. *Piesco v. Koch*, 12 F.3d 332, 340 (2d Cir. 1993) (internal punctuation and citation omitted); *see also Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir. 1993) (noting the purpose of this rule is to prevent a party from using a post-verdict motion for judgment as a matter of law as "a trap").

There is no disagreement that Precise *never* argued in its Rule 50(a) motion that a reasonable factfinder could not construe the text of RBC's offer as seeking a long-term requirements contract. *See, e.g.*, ECF## 178, 204 (Rule 50(a) motion and oral argument). Remarkably, Precise did not even raise it belatedly in its post-verdict Rule 50(b) motion. As discussed above, Precise focused instead on obtaining a ruling that RBC's offer was not legally an offer at all capable of acceptance, so that the only offer was Precise's purchase order which (while containing RBC's offered pricing) did not expressly mention a long-term deal for Precise's full requirements. Instead, as shown above, the district court admitted it

31

was raising the issue on its own accord, throwing RBC a "curve ball," and allowing supplemental briefing before granting judgment for Precise.

Where a party fails to move for judgment as a matter of law under Rule 50(a), judgment as a matter of law under Rule 50(b) may only be granted to prevent a "manifest injustice." *ING Global*, 757 F.3d at 97; *Provost v. City of Newburgh*, 262 F.3d 146, 162 (2d Cir. 2001); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998). Strictly adhering to the manifest injustice standard is particularly apt here where Precise did not even raise the argument in its own Rule 50(b) motion, let alone its pre-verdict Rule 50(a) motion.

To find manifest injustice, this Court must determine that the jury's verdict was "wholly without legal support." *ING Global*, 757 F.3d at 97. It is a more stringent standard than the already exacting standard requirement to grant judgment as a matter of law if a party has properly followed Rule 50's procedural requirements. *Rothstein v. Carriere*, 373 F.3d 275, 291 (2d Cir. 2004). This Court has described the manifest injustice standard as "extraordinary." *Rodick v. City of Schenectady*, 1 F.3d 1341, 1347 (2d Cir. 1993). Thus, judgment as a matter of law under the manifest injustice standard is very much the exception, rather than the rule.

A careful search has turned up no cases in which this Court upheld a district court's decision to *sua sponte* issue judgment as a matter of law under the manifest

injustice standard in a standard commercial contract dispute, which is what this case plainly is. *Cf.* Moore's Federal Practice 3d, § 50.05[5][b][i], at 50-26 (stating "[a] trial court is generally barred from rendering post-verdict judgments as a matter of law sua sponte," and collecting cases).

### B. The District Court Granted Judgment as a Matter of Law Without Satisfying Either the Usual Strict Rule 50(b) Standard or the Even Stricter Manifest Injustice Standard

#### 1. The District Court Applied the Wrong Standard

The district court threw out the jury's verdict despite acknowledging conflicting evidence on the central issues in this case. It made its own credibility determinations even while acknowledging that RBC's view of the parties' contract was not outside the realm of possibilities. Under the ordinary standards of Rule 50(b), the court stepped outside of its role by overturning the jury's verdict. The grant of judgment was especially inappropriate here where the court raised an issue that even Precise did not think worth pursuing in its motions. The court could only do so to prevent manifest injustice, where the jury's verdict was "wholly without legal support." *ING Global*, 757 F.3d at 97. That standard was not met here, however. In fact, it is not even a close question.

In structuring its analysis in its post-verdict Ruling, the district court plainly did not adhere to these legal standards. The Ruling began by holding that a reasonable jury could have construed the language in RBC's offer as "an offer to

enter into a requirements contract that Precise accepted." ECF#225 at 43. After conceding that a reasonable reading of the plain language of the offer was that it was for a five-year requirements contract (and that Precise accepted it) the court examined the evidence surrounding its acceptance by Precise. The court found conflicting evidence and then impermissibly drew its conclusions in favor of Precise. *See infra* at 38-44. It concluded that "as a matter of policy, Precise did not enter into binding LTAs with any of its suppliers," ECF#255 at 44, although it also recognized that Precise entered into a binding long-term agreement with Accurate, *id.* at 44 n.16. Similarly, it found "RBC had no reason to believe that it could get Precise to accept a binding five-year requirements contract," *id.* at 46, although it also noted that "upon receipt of [Precise's purchase order], [an RBC employee] recalled thinking that RBC had 'won' the business for five years," *id.* at 10.[9] These internal inconsistencies in the district court's opinion demonstrate that it could not have applied the correct standard of review in granting judgment as a matter of law. Having concluded that the jury reasonably read RBC's offer as for a five-year requirements contract, that there was evidence that RBC wanted to enter

---

[9] *Compare also id.* at 46 ("Although RBC indicated that it did not want to 'split the business,' RBC did not explain that this statement meant it needed a five-year requirements contract.") *with id.* (arguing that "even if [RBC] had" explained to Precise that it wanted a five-year requirements contract, this was not conclusive).

into a five-year requirements contract, and that Precise accepted this offer, the court's analysis should have ended—it should have ruled in RBC's favor.

Additionally, the language of the district court's opinion is sprinkled with references that indicate the court applied a lesser standard than the stringent manifest injustice standard applicable here. *See, e.g.*, *id.* at 38 ("I *began to question* whether RBC's [offer] was sufficient to bind Precise to a five-year requirements contract.") (emphasis added); *id.* ("[M]y *doubts* arose.") (emphasis added); *id.* at 39 ("[T]he jury's interpretation of the parties' contract *did not seem* to reflect the surrounding circumstances.") (emphasis added). "Doubts" and "questioning" are, of course, very different from the requirement under Rule 50(b) that there be "but one conclusion . . . that reasonable men could have reached." *Cross*, 417 F.3d at 248 (internal punctuation and citation omitted). They certainly do not warrant the "extraordinary" conclusion that manifest injustice requires overturning the verdict on grounds raised *sua sponte* by the court. *Rodick*, 1 F.3d at 1347. *See infra* at 45-46 (applying case law construing the manifest injustice standard to the record in this case).

### 2. The District Court Improperly Required "Magic Terms" to Enter into a Requirements Contract

The UCC expressly allows for requirements contracts, stating "[a] term which measures the quantity by . . . the requirements of the buyer means such actual . . . requirements as may occur in good faith." Conn. Gen. Stat. § 42a-2-

306(1). In other words, a requirements contract "is generally defined as a contract in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller." *Upsher-Smith Labs., Inc. v. Mylan Labs., Inc.*, 944 F. Supp. 1411, 1426 (D. Minn. 1996) (internal punctuation and citation omitted). The UCC does not require that the parties use "buzz words" or "magic terms" to enter into a requirements contract. *Koch Hydrocarbon Co., a Div. of Koch Indus. v. MDU Res. Grp., Inc.*, 988 F.2d 1529, 1541 (8th Cir. 1993); *Ceredo Mortuary Chapel, Inc. v. United States*, 29 Fed. Cl. 346, 350 (1993). This is in keeping with the flexible nature of contract formation under the UCC.[10] As Judge Posner observed, "[t]he [UCC], its draftsmen mindful of the haste and sloppiness, and disregard for lawyerly niceties, that characterize commercial dealing, tolerates a good deal of incompleteness and even contradiction in offer and acceptance." *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1230 (7th Cir. 1995).

---

[10] *See* Conn. Gen. Stat. § 42a-2-204 ("A contract for the sale of goods may be made in any manner sufficient to show agreement."); Conn. Gen. Stat. § 42a-1-201(3) (defining an "agreement" as "the bargain of the parties in fact, as found [1] in their language or [2] inferred from other circumstances, including [3]course of performance, [4] course of dealing or [5] usage of trade").

Although the district court recognized these principles of law, ECF#255 at 39-40, it did not apply them. RBC's offer contained the terms: "PRICING IS SUBJECT TO 100% OF THE VOLUME THAT PRECISE HAS TO BUY DURING THIS PERIOD" and "Quantity From 1 To 9,999." Other courts have found similar language sufficient to form a requirements contract. *See, e.g.*, *In re Delphi Corp.*, 394 B.R. 342, 344 (S.D.N.Y. 2008) ("Specifically, this intent is demonstrated by language in the Contracts requiring Automodular to supply 100 percent of Delphi's particular subassembly needs, typically at a fixed price."); *Essco Geometric v. Harvard Indus.*, 46 F.3d 718, 722 (8th Cir. 1995) (offer for requirements contract where seller stated "[w]e are with the understanding that our bids covers supplying the foam for the entire projectile 350,000 to 500,000 Double Shell office chairs as called for from 2/1/90 thru 1/31/92. Our pricing is to remain fixed throughout the stated time period").

The district court, however, held that "fairly read" this offer did not convey a requirements contract. ECF#255 at 42. It focused on the fact that the offer did not contain the word "requirements," *id.* (noting that unlike an earlier RBC proposal, this offer did not state it was for 100% of the "quantities needed to meet Precise's requirements"), that RBC's proposal was not termed as a "long-term agreement," *id.*, and that RBC used the term "split the business," rather than "requirements contract," when discussing its proposal with Precise, *id.* at 46. However, under the

37

UCC and the case law interpreting it, none of these are necessary to enter into a requirements contract.[11]

### 3. The Jury Was Entitled to Draw Inferences in RBC's Favor from the Extrinsic Evidence Surrounding the Offer

The district court also improperly rejected the jury's conclusion reached after it examined the evidence at trial concerning the circumstances surrounding the offer and its acceptance. Extrinsic evidence is often critical in determining the parties' intent in forming a UCC contract.[12] This, again, is due to the flexible

---

[11] There was nothing unique or surprising about RBC and Precise transacting business on a Quote and Purchase Order basis; indeed both parties preferred to transact business by exchanging their commercial forms, not lengthy, lawyerly, written documents such as the contracts that Spirit and Boeing prefer. Tr.79-80, 833-36; Ex.275. Unmentioned in the district court's Ruling is that 88 percent of RBC's business is done that way, and that aerospace companies regularly transact business for short- and long-term periods by using the quote and purchase order avenues—as RBC's liability expert testified, and as was the case between RBC and Precise and even as between Precise and Accurate. Tr.79, 537-41, 873-75. The district court simply credited Precise's liability expert over RBC's expert on the issue of industry custom and contracting practices, which again a court may not do under Rule 50. *Compare* Ruling, ECF#255, at 3 *with* Tr.79, 537-41, 873-75.

[12] The UCC allows for the introduction of extrinsic evidence in all cases. *See* Conn. Gen. Stat. § 42a-1-201(3) (general definitions); Conn. Gen. Stat. § 42a-1-303 (Course of performance, Course of Dealing, and Usage of Trade); Conn. Gen. Stat. § 42a-2-202 (Written Expressions, and Extrinsic Evidence and Parol Evidence); Conn. Gen. Stat. § 42a-2-202 cmt. 2; Conn. Gen. Stat. § 42a-2-204 (Formation in General); Conn. Gen. Stat. § 42a-2-204 cmt. 1; Conn. Gen. Stat. § 42a-2-201 cmt. 1 ("The required writing need not contain all the material terms of the contract and such material terms need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. It may be written in lead pencil on a scratch pad.").

nature of contracting under the UCC.  The parties' intent in forming a contract is, of course, "an issue of fact," *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990), especially when there is conflicting evidence on that issue, *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990).  Here, the jury resolved any questions about the parties' intent in RBC's favor, finding that there was a five-year requirements contract.  The district court displaced that finding.  In doing so, it failed to give RBC "all reasonable inferences that the jury might have drawn in its favor."  *ING Global*, 757 F.3d at 98; *see United States v. Landau,* 155 F.3d 93, 102 (2d Cir. 1998) (reversible error where "the district court both weighed the evidence and failed to consider the evidence in the light most favorable to the [prevailing party at trial]").  This is reversible error.

RBC presented evidence at trial that while Precise may have been hesitant to enter into long-term agreements, it had no such qualms about entering into requirements contracts.  As discussed in detail, *supra* at 15-17, over the course of their fifteen-year relationship, RBC and Precise "typically" would talk about "requirements."  Tr.758-59.  Indeed, Precise described its orders as "requirements" and regularly adjusted them with revised purchase orders to reflect its fluid

demand. And Precise did so due in part to the nature of the Boeing 737 supply chain.[13]

Further, there was undisputed evidence at trial that Precise could—and did—overcome its aversion to multi-year requirements contracts, as it entered into a five-year requirements contract with Accurate immediately after it breached its contract with RBC. ECF#255 at 44 n.16. Although the district court disregarded the Accurate long-term requirements contract as of "no bearing," *id.*, it failed to draw the reasonable inference that if Precise was willing to enter into a long-term requirements contract with Accurate for the same product and under the same circumstances, it was willing to enter into one with RBC as well. Thus, the district court's conclusion that "as a matter of policy, Precise did not enter into binding [long-term agreements]," *id.* at 44, failed to draw the reasonable inference that Precise was willing to enter into a long-term requirements contract if the circumstances were right.

---

[13] Precise's own liability expert, Jon Diver, testified on cross-examination that Spirit and Boeing rarely—if ever—exercise termination for convenience clauses in their contracts. Tr.1207-10. Although the district court could have mentioned as much, when it focused so heavily on Spirit's termination for convenience rights, the court's Ruling said nothing about how infrequently those rights are exercised. The Ruling also failed to mention that Precise's expert is a regular member of Precise's payroll with a consulting-contract that paid him approximately $84,000, while further omitting that RBC's liability expert, Randall Burton (an independent executive from Dixie Aerospace) testified that requirements contracts are prevalent in the aerospace industry notwithstanding hypothetical concerns about termination for convenience. Tr.1210-15, 537-41.

RBC proved at trial that in the spring of 2009, the circumstances were indeed right. It was undisputed that Precise was under pressure from Spirit to reduce its prices. *Id.* at 5 (recognizing that in spring 2009, "Precise scrambled to cut costs"). It was likewise undisputed that Precise reacted to that pressure by asking RBC to cut its prices. *Id.* RBC was willing to do so for a *quid pro quo*: a five-year requirements contract. RBC's witnesses testified that RBC told Precise it wanted to ensure that it would not "split the business." *See, e.g.*, Tr.984; Tr. 387. Likewise, there was testimony from Precise's *own* witnesses that they agreed not to "split the business." *See, e.g.*, Tr.1029-30. The jury reasonably inferred that RBC communicated to Precise the following deal: RBC would lower its prices, and in turn, Precise would enter into a five-year requirements contract with RBC whereby it would purchase all of its requirements for the bearings exclusively from RBC. Although the district court found that Precise's witnesses testified that they had a different interpretation of what RBC meant by "split the business," and that interpretation was "reasonable," ECF#255 at 46 n.17, in point of fact this reading of the term "split the business" has no relation to reality. Even if "split the business" has more than one possible interpretation (which RBC certainly does not concede), the jury drew the very reasonable inference that RBC was bargaining for *all* of Precise's business through 2015; *i.e.*, for a requirements contract.

41

RBC also presented evidence from which the jury inferred that Precise understood that RBC was offering to enter into a five-year requirements contract. Specifically, RBC presented evidence that Precise created internal projections of its five-year requirements through 2015, *i.e.*, its estimated purchases of the bearings from RBC through 2015 if it honored its contract. Exs. 18, 47; Tr.1086-88. Precise's act in drawing up these projection and estimates is consistent with an understanding of the agreement as a five-year requirements contract. The district court did not mention these internal projections when reaching its own conclusion that the parties did not agree to a five-year requirements contract. *See* ECF#255 at 39-48. Through this omission, the court failed to consider evidence from which the jury could have drawn the reasonable inference that Precise understood it was entering into a five-year requirements contract, and that it planned accordingly. In so doing, the court impermissibly "usurped the role of the jury." *Cruz*, 34 F.3d at 1157.

### 4. The District Court Made Credibility Determinations

Ultimately, the district court's ruling rested on its determination that "Precise quite clearly did not understand the pricing subject to 100% volume language as mandating exclusivity for five years." ECF#255 at 46. Apart from inappropriately turning a classic fact issue concerning a party's of the state of mind into a legal issue, the court's finding is dead wrong. The court's determination

ignores the testimony by a Precise witness who acknowledged that through its offer, "RBC is asking for 100 percent of the volume through 2015." Tr.856. Likewise, Precise witnesses acknowledged that RBC wanted to "keep all of the business." Tr.987. Although the district court claims that "RBC does not dispute that Precise did not interpret its quote to offer a five-year requirements contract," ECF#255 at 46, this is not true. RBC contended vigorously at trial that it told Precise it was offering a five-year requirements contract, first at the May 2009 meeting and then through the June 2009 offer. *See supra* at 18-23. Indeed, in June 2009, it carefully crafted a formal offer (which it did not typically do), Ex.19, sent both the offer and a separate email communicating that offer to Precise, Exs.1, 20, and called Precise twice to ensure that it understood RBC was offering a five-year requirements contract, Tr.387, 394-95.

The district court's observation that RBC went through the "back door" trying to confuse Precise so it would agree to a contract it did not want, is therefore at odds with the facts. *See* ECF#255 at 46. RBC went through the "front door," not the "back door," when making its offer to Precise. Furthermore, the lack of any actual confusion between the parties concerning RBC's offer explains why Precise's team of lawyers did not attack this issue in Precise's Rule 50(a) or Rule 50(b) papers. Instead, Precise argued that boilerplate language on RBC's form document used in the offer somehow made RBC's offer conditional and not an

offer at all, a theory RBC also rebutted at trial and in the post-verdict briefing—

and the district court agreed, rejecting Precise's articulated ground for Rule 50(b)

relief. *See* ECF#255 at 31-37.

The jury was free to discredit any self-serving testimony of Precise's

witnesses who claimed they did not understand they were entering into a five-year

requirements contract.[14] Likewise, the jury was free to credit the testimony of the

RBC witnesses who testified to the contrary, and indeed, of the testimony by

Precise's own employees that supported RBC's position.[15] Even if the district

---

[14] The district court referred to testimony that supposedly showed confusion by Precise as to the terms of the deal. *See* ECF#255 at 46. Yet, the cited portions of the record (Tr.402, 463) are not a basis for displacing the jury's verdict. While that testimony may show that Precise pretended confusion as to the terms of the contract during its dispute with RBC (and that RBC's employees might have politely described them as "confused," rather than as "liars"), the jury was free to accept or reject Precise's position.

[15] The district court's Ruling makes much of the fact that RBC considered all of its options in an effort to salvage the parties' once amicable and profitable business relationship after learning that Precise was going to breach their contract. *See* ECF#255 at 15-24. Among other things, RBC participated in numerous calls with Precise, had a flurry of emails with Precise, evaluated whether it would offer new one year prices, suggested that Precise memorialize their existing agreement by executing the type of lawyerly written document that Precise disliked in the past, demanded adequate assurances that Precise would perform, but ultimately Precise would not honor its obligations having already ordered $1.7 million in bearings under its new long term deal with Accurate (and never telling RBC about it). While the jury was free to credit this information, it was also free to place as little or much weight on it as related to the meaning of their agreement. It would appear the court placed more weight on this evidence than the jury, but that is no reason to disturb the verdict in light of the compelling evidence—from the contract formation stage—that the parties entered into a five-year requirements contract.

court disagreed with the jury's credibility determinations, it is "beyond the province of the district court . . . to second-guess [the jury's] . . . credibility assessments." *Tolbert v. Queens Coll.*, 242 F.3d 58, 73 (2d Cir. 2001).

### 5. This Court's Precedent Mandates Reversal

The recent precedent of *ING Global* is instructive. *See ING Global*, 757 F.3d 92. In *ING Global,* also a requirements contract case, this Court clarified the manifest injustice standard for a court to *sua sponte* to grant judgment as a matter of law. The parties in *ING Global* tried the case to a jury over six days. *Id.* at 94. The jury found in favor of ING Global on its breach of contract claims, and also awarded it attorneys' fees. *Id.* The district court granted judgment as a matter of law in favor of the defendant on the issue of attorneys' fees under the manifest injustice standard. *Id.* at 96. This Court reversed. It held that, "[c]onsidering this evidence in the light most favorable to ING, and giving ING the benefit of all reasonable inferences that the jury might have drawn in its favor, we have little trouble concluding that a jury, though not compelled to do so, could have found that [the defendant] acted in bad faith," therefore warranting the award of attorneys' fees. *Id.* at 98. According to this Court, "[u]nder these circumstances, we see no injustice and certainly no manifest injustice." *Id.*

Indeed, over the years, this Court has made clear what does not constitute manifest injustice. Factors that this Court has found *insufficient* to show manifest injustice include:

- "Thin" evidence. *See Samuels*, 992 F.2d at 17 ("However thin the evidence, it was not such that a reasonable jury could reach only one conclusion."); *Mealey v. Apartment Rentals*, 125 F.3d 844 (2d Cir. 1997) ("The proof offered by Apartment Rentals was thin, but we cannot say that the jury verdict was wholly without legal support."). *See also Cash*, 654 F.3d at 339 (reversing and remanding district court's grant of judgment as a matter of law under the less onerous Rule 50(b) standard even after finding "this case presents a close question").

- A "surprising" jury verdict. *See Mealey*, 125 F.3d 844 ("To be sure, the jury verdict in this case may be surprising in some important respects, but a review of the trial record does not permit us to conclude that manifest injustice occurred when the district court allowed the jury verdict to stand.").

- Conflicting testimony. *See Thomas v. O'Brien*, 539 F. App'x 21, 22 (2d Cir. 2013) ("Since Appellees' testimony conflicted with Appellant's, the jury was required to make a credibility determination, which we see no basis for disturbing.")

- A jury verdict based on inferences drawn from the evidence. *See Cruz*, 34 F.3d at 1156 (reversing district court's granting of judgment as a matter of law under the manifest injustice standard because "contrary to the district court's conclusion, we believe that a reasonable juror could have utilized this information to make a reasonable jury award").

In this case, just as in *ING Global*, "a jury, though not compelled to do so," could have found in favor of RBC. 757 F.3d at 98. The evidence here, as show above in abundance, was not even "thin" and the result was not even "surprising." Even if the district court believed otherwise, this is not sufficient to find judgment

as a matter of law in favor of Precise. The district court's ruling granting judgment for Precise should be reversed.

## II. The District Court's Conditional Grant of a New Trial Was Also Reversible Error

The district court sought to ensure the jury's verdict would not stand, not only granting judgment as a matter of law under Rule 50(b) but also granting a new trial under Rule 59 in the event the Rule 50(b) ruling did not withstand appellate review. *See* ECF#255 at 48 (granting a conditional new trial because "the jury's verdict . . . is manifestly against the weight of the evidence in this case"). The basis for that ruling, *see id.*, was the same as that underlying the grant of judgment as a matter of law, *i.e.,* the court's own view of conflicting evidence and credibility determinations. Also, once again, the court went down this path to rule on an argument not raised by Precise itself in its post-verdict motion for a new trial. *See* ECF#226. The court erred, and its conditional grant of a new trial should be reversed.

The district court's ruling granting a new trial is reviewed for an abuse of discretion. *Stampf v. Long Island R. Co., 761 F.3d 192, 202 (2d Cir. 2014). "A district court abuses its discretion when (1) its decision rests on an error of law (such as the application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of

permissible decisions."  *Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 417 (2d

Cir.) *cert. denied*, 133 S. Ct. 789 (2012) (internal citation and quotation omitted).

### A. The District Court Is Held to a Strict Standard When Disregarding the Jury's Verdict and Ordering a New Trial Because the Verdict Is Against the Weight of the Evidence

Under Rule 59, a district court may grant a motion for a new trial after a jury

verdict "for any reason for which a new trial has heretofore been granted in an

action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).[16]  Further, the district

court may grant a new trial *sua sponte* after giving the parties notice and an

opportunity to be heard.  Fed. R. Civ. P. 59(d).[17]

Unlike when deciding a motion for judgment as a matter of law, when

deciding whether to grant a new trial a district court may weigh the evidence.

*Raedle*, 670 F.3d at 418.  It may also consider the credibility of witnesses.  *Id.*

Finally, it is not required to view all the evidence in "the light most favorable" to

_____

[16] District courts in this Circuit have granted new trials for a wide variety of reasons under Rule 59.  Examples include misconduct by the jury, *see Jorgensen v. York Ice Mach. Corp*., 160 F.2d 432, 435 (2d Cir. 1947) (noting new trial must be ordered where there is "[d]runkenness, bribery, receiving incompetent documents, or privately interviewing a party" by the jury), or the jury verdict is inconsistent, *see Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir. 2006) (noting a motion for a new trial "ordinarily should not be granted" and ordering new trial where jury gave inconsistent responses to special interrogatories) (internal punctuation and citations omitted).

[17] As with a grant of judgment as a matter of law *sua sponte*, a survey of the case law indicates that district courts in this Circuit rarely grant a new trial under Rule 59(d) on grounds not raised by a party.

the prevailing party at trial. *Id.* Nevertheless, the standard for granting a new trial is high when, as here, the jury verdict is reversed as against the weight of the evidence. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998); *see also* Moore's Federal Practice 3d, § 50.92[2], at 50-130.1 to 50-131 (noting that "a more stringent standard applies when an alternative motion for a new trial is based on the insufficiency of evidence at trial"). As this Court has recently explained, "[a] decision is against the weight of the evidence *if and only if* the verdict is (1) seriously erroneous or (2) a miscarriage of justice." *Raedle*, 670 F.3d at 417-18 (internal punctuation and citations omitted) (emphasis added).

This Court has instructed district courts to exercise caution before reversing a jury verdict on the basis that the verdict was against the weight of the evidence. A district court should accord a "high degree of deference" to a jury's evaluation of credibility. *Id.* at 418. In other words, "[t]rial judges must exercise their ability to weigh credibility with caution and great restraint . . . and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* (internal punctuation and citation omitted); *see also Elyse v. Bridgeside Inc.*, 367 F. App'x 266, 268 (2d Cir. 2010) (noting that when deciding whether to grant a new trial, a district court "must refrain from invading the province of the jury to evaluate the credibility of the witnesses"); *McClary v. Coughlin*, 87 F. Supp. 2d 205, 220 (W.D.N.Y. 2000)

49

(declining to *sua sponte* reverse for a new trial, as the jury's "credibility determinations are entitled to deference and, in the absence of a miscarriage of justice, will not be lightly tossed aside"), *aff'd sub nom. McClary v. Kelly*, 237 F.3d 185 (2d Cir. 2001). This is because when a district court grants a new trial based on its own assessment of a witness's credibility, it creates tension between the Seventh Amendment right to trial by jury and the district court's power to set aside a verdict. *Raedle*, 670 F.3d at 418. In these circumstances, "jury verdicts should be disturbed with great infrequency." *Id.* A court should only grant a new trial in such a case when the jury verdict is "egregious." *DLC Mgmt. Corp.*, 163 F.3d at 134 (internal punctuation and citation omitted); *see also Maureen Christensen v. Cnty. of Dutchess, N.Y.*, 548 F. App'x 651, 653 (2d Cir. 2013) (noting under the new trial standard, "jury verdicts should be disturbed with great infrequency") (internal punctuation and citation omitted).

Thus, in *Raedle*, an employment case, the plaintiff won at trial after the jury deliberated for about an hour and a half. 670 F.3d at 415. The judge then invited the defense to move for a new trial stating: "[O]bviously that is a jury question, but the fact that not one word of testimony came from a [defense] witness as to what communications were made and by whom . . . to me . . . makes it impossible to accept this verdict as in accordance with the weight of the evidence." *Id*. The defense accepted the judge's invitation, and moved for a new trial, which the judge

50

granted under Rule 59. *Id.* This Court found reversible error. *Id.* at 420. The Court noted the district court realized this was a dispute over credibility, that the jury found a key witness to be credible in reaching its decision, and the district court did not even necessarily disagree but reached a different conclusion about the weight of the evidence. *Id.* at 419-20. It held that "[n]one of this testimony was bizarre, far-fetched, patently incredible or defiant of physical realities" and thus "[t]he verdict, grounded in this fashion in the record, cannot be said to have been either egregious or a serious miscarriage of justice." *Id.* at 420 (internal punctuation and citation omitted). It concluded "the district court abused its discretion" in granting a new trial and ordered the verdict reinstated. *Id.*

## B. The District Court's Ruling Granting a New Trial Did Not Satisfy the Legal Standards

As with its grant of judgment as a matter of law, the district court's ruling granting a new trial is not in accord with this Court's precedent.

First, and most importantly, the district court substituted its own determinations of credibility for that of the witnesses. In reaching its verdict, the jury credited the testimony of RBC's witnesses that RBC had communicated an offer to enter into a five-year requirements contract to Precise (and the jury may have credited the testimony of Precise's own witnesses supporting RBC's position). The district court may have disagreed with that assessment, but it was not entitled to substitute its own view of the witnesses' credibility for that of the

51

jury's. *See Green v. City of New York*, 359 F. App'x 197, 199 (2d Cir. 2009) (reversing grant of new trial after concluding "that the district court substitut[ed] its own judgments for that of the jury's"); *compare U.S. v. Cote*, 544 F.3d 88, 102 (2d Cir. 2008) (overturning, in criminal case, district court's decision to remand for new trial where court "substituted its own layman's view . . . for the jury's assessment of the evidence"). To hold otherwise, the district court would have to have found that the jury could not have reasonably credited RBC's testimony over Precise's. *See Raedle*, 670 F.3d at 420; *see also ING Global*, 757 F.3d at 99 (no new trial warranted where "jury free to reject [certain evidence] and to conclude, based on other testimony, that [the plaintiff should prevail]"). The district court made no such finding.

Nor could it have done so. Nothing about RBC's testimony was "bizarre, far-fetched, patently incredible or defiant of physical realities." *Raedle*, 670 F.3d at 420. Rather, it was consistent with RBC's actions throughout the course of 2009 and 2010, and with RBC's evidence and behavior throughout the litigation. In sum, although required to give significant deference to the jury's credibility determinations, the district court instead summarily ignored them in the brief paragraph of its order granting a new trial. In so doing, the district court applied the wrong legal principal, and thus abused its discretion. *Raedle*, 670 F.3d at 417.

Additionally, the mere fact that the district court believed there was conflicting evidence over certain issues is not sufficient to grant a new trial. As discussed earlier, to reverse a jury's verdict as against the weight of the evidence, the verdict must be "seriously erroneous" or a "miscarriage of justice." Mere dispute between the parties over some questions of fact is not sufficient. *See Binder v. Long Island Lighting Co.*, 57 F.3d 193, 202 (2d Cir. 1995) (reversing grant of new trial as jury's verdict, "while not inexorable, was clearly not seriously erroneous"), *abrogated on other grounds by James v. New York Racing Ass'n*, 233 F.3d 149, 155 (2d Cir. 2000). Here, as in *Binder*, the jury was presented with evidence from which it could have drawn inferences in favor of RBC, and likewise could "easily have disbelieved" any testimony offered by Precise to the contrary. *Id.* at 200. It weighed the evidence, and found in favor of RBC. Nothing about this amounts to a "miscarriage of justice" or is "seriously erroneous." It is worth reiterating (*see supra* at 7-8) that the district court recognized multiple times that questions about the interpretation of this contract were for the jury to decide. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 875 (2d Cir. 1992) (reversing grant of new trial where "the district judge explicitly recognized . . . this 'is a straight credibility issue for the jury[,]' but [i]n later granting the new trial motion, the judge gave no reason for his change of mind").

In short, the district court's error in granting a new trial rested on the same erroneous legal grounds as those supporting its grant of judgment as a matter of law. *See Green*, 359 F. App'x at 199 (reversing grant of new trial, where "[w]e conclude that the district court's decision to grant defendants' Rule 59(a) motion rests on the same legal errors underlying its grant of the Rule 50(b) motion"); *see also Binder*, 57 F.3d at 202 (reversing grant of new trial "[f]or the reasons stated in . . . our reversal of the instant grant of judgment n.o.v."). The district court disregarded the jury's credibility determinations. It cherry-picked those parts of the evidence that supported its view of the case, and ignored those that did not. RBC proved its case at trial. Neither Rule 50 nor Rule 59 allows the district court to reverse because it disagreed with that outcome.[18]

---

[18] To the extent that the district court's opinion granting a new trial rested not on its weighing of the evidence, but on "erroneous jury instruction," *see* ECF#255 at 48, this was not an appropriate ground to grant a new trial. First, the district court did not give the parties notice and an opportunity to be heard on that issue, as required under Rule 59(d). Second, the district court's one-sentence ruling on this simply does not explain why the instructions given to the jury "gave a misleading impression or inadequate understanding of the law," which is required to grant a new trial. *Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008) (internal punctuation and citation omitted). Third, the argument fails on the merits, as the jury did receive extensive instructions on the formation of a requirements contract (as the district court recognized). *See* ECF#188 at 15 (jury instructions defining requirements contract); *id.* at 10-14 (defining formation of a contract); *id.* at 14-17 (defining contract terms).

54

### C. This Court Should Reinstate the Jury Verdict

Where the district court has erred in granting judgment as a matter of law, and it is not appropriate to grant a new trial, the remedy is straightforward: this Court should reinstate the jury verdict. *See, e.g.*, *ING Global*, 757 F.3d at 99 (ordering jury verdict to be reinstated after reversing grant of judgment as a matter of law and concluding no new trial warranted); *Cash*, 654 F.3d at 344 (ordering judgment consistent with jury verdict where defendants were neither entitled to judgment as a matter of law nor new trial); *Sorlucco*, 971 F.2d at 875 (ordering jury verdict to be reinstated after reversing grant of judgment n.o.v. and for new trial). Here, as the district court erred in granting both judgment as a matter of law and a new trial, the jury's verdict in RBC's favor must be reinstated.

### CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court granting Precise judgment as a matter of law on RBC's claim for breach of a five-year requirements contract, and conditionally a new trial, and remand with directions to reinstate the jury's verdict and enter judgment for RBC in accordance with that verdict.

55

Respectfully submitted,

  /s/Jeffrey R. Babbin      
Jeffrey R. Babbin
Joseph W. Martini
Matthew C. Brown
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Tel.: (203) 498-4400
Fax: (203) 782-2889
jbabbin@wiggin.com

*Attorneys for*
*Plaintiff – Appellant*
*RBC Aircraft Products, Inc.*

Dated: November 25, 2014

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Rule 32(a)**

**Certificate of Compliance With Type-Volume Limitation, Typeface Requirements and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒   This brief contains 13,810 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), **or**

    ☐   This brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

    ☒   This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point type Times New Roman type style, **or**

    ☐   This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: November 25, 2014                    By: _/s/Jeffrey R. Babbin_
                                                           Jeffrey R. Babbin

## CERTIFICATE OF SERVICE

I hereby certify that, on November 25, 2014, the Page Proof Brief of

Plaintiff-Counter-Defendant – Appellant RBC Aircraft Products, Inc. was filed and

served electronically via CM/ECF.  Because the brief was filed after the last FedEx

pick-up, on November 26, 2014, six (6) copies of the brief will be mailed via

FedEx Priority Overnight to:

> Catherine O'Hagan Wolfe, Clerk
> United States Court of Appeals for the Second Circuit
> Thurgood Marshall United States Courthouse
> 40 Foley Square
> New York, NY 10007

I further certify that on November 26, 2014, two copies of the brief will be

mailed via first-class mail to:

James K. Robertson
Ann H. Rubin
Carmody Torrance Sandak & Hennessey LLP
50 Leavenworth Street
Waterbury, CT 06721
203-573-1200

> By: /s/Jeffrey R. Babbin
> Jeffrey R. Babbin